# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DAVID L. ORLECK, | : | Case No. 3:15-cv-279 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff David Orleck applied for Supplemental Security Income on April 10,

2012.  He asserted that after working as a self-employed tractor-trailer driver for several

years, he could no longer work a substantial paid job as of January 6, 2012 due to

degenerative disc disease of the lumbar spine and cervical spine, status post left-sided

lisfranc fracture, depression, anxiety, and posttraumatic stress disorder.  His application,

medical records, and other evidence proceeded to a hearing before Administrative Law

Judge (ALJ) John S. Pope who later issued a written decision.  The result of his decision

was the denial of Plaintiff's application based on his central conclusion that Plaintiff was

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

not under a "disability" as defined in the Social Security Act. Plaintiff brings the present case challenging ALJ Pope's non-disability decision.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record (Doc. #6), and the record as a whole. Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Pope's non-disability decision.

## II. __Background__

Plaintiff asserts that he has been under a "disability" since January 6, 2012. He protectively filed his application on April 10, 2012. He was forty-eight years old at the time and was therefore considered a "younger person" under Social Security Regulations. He is now considered a person "closely approaching advanced age." He completed ninth grade and then obtained a GED. He worked as a tractor-trailer driver for many years. Plaintiff's significant health problems include degenerative disc disease of the lumbar spine and cervical spine, status post left-sided lisfranc fracture, depression, anxiety, and posttraumatic stress disorder.

### A. __Plaintiff's Testimony__

Plaintiff testified at the hearing before the ALJ that he last worked on December 10, 2011 as a self-employed tractor-trailer driver. (Doc. #6, *PageID* #108). He stopped working because he was having multiple panic attacks while driving, he could not remember where he was going, and he was so disoriented when he woke up that he did not know what state he was in. *Id.* He worked between eighty and one hundred hours

2

per week between 2006 and 2011, but he did not have any net earnings because he either "broke even" or was "in the negative." *Id.* at 133-36.

Plaintiff testified that he gets migraine headaches that go down to his shoulders. *Id.* at 126. He experiences pain in his shoulders "all the time," and it "[b]urns and it feels like I have heavy weights pulling down on my shoulders and arms." *Id.* at 127. He also broke his neck in three places, dislocated his right shoulder, and "broke the tips off" three of his vertebrae. *Id.* at 112. Plaintiff has back pain that "feels like I have a rod and if I move in any direction that rod pinches and I get muscle spasms down the right side of my back that will cause my left leg to go completely numb." *Id.* at 127. He also has pain in his hip resulting from problems with his lumbar spine. *Id.* at 111. The hip pain "feels like I'm being poked with a hot knife." *Id.* at 129. Despite having surgery to repair a lisfranc fracture in his right foot, he feels like he has "screws protruding through it" when he steps on it. *Id.* at 110. He also has pain in his left foot all the time. *Id.* at 128.

Plaintiff sees a family doctor at Five Rivers Health Center approximately once or twice per year. *Id.* at 113. They talk to him about his pain. *Id.* at 114. However, they do not prescribe any pain medication. *Id.* They referred him to a pain clinic and a spinal clinic, but he has not been able to schedule an appointment because he does not have health insurance. *Id.* Plaintiff had surgery to repair his foot in January 2012 by Dr. Mark Weber from Dayton Orthopedic Associates. *Id.* at 115. He did not follow-up with Dr. Weber because he did not have money to pay the bill. *Id.* He has difficulties obtaining pain medication and smokes marijuana for pain relief. *Id.* at 137. He smokes marijuana because,

3

> I have no other pain relief.  I have begged, I have cried and begged to a
> doctor to help me.  I'm too worthless or not worthless enough that I can't
> get the help that other people that never worked get and so my only option
> is to continue on doing what I've done and what benefit it gives me is all I
> get.

*Id.* at 136-37.  He stated that the only thing other than medication that reduces his pain is

sex.  *Id.* at 129.

Plaintiff has received psychological treatment since September 2012.  *Id.* at 122.

He was diagnosed with sustained depression and posttraumatic stress disorder.  *Id.*  He

also has "a lot of anger towards the medical community."  *Id.*  He began seeing a

therapist twice per month but can now only afford to go once per month.  *Id.* at 122-23.

Plaintiff is also seeing a psychiatrist, Dr. Glass.  *Id.* at 123.  When asked if his depression

affects his work ability, he responded, "it kind of runs hand-in-hand with my pain.  When

the pain goes up, the depression goes up.  When the depression goes up, the pain goes up,

they kind of work together."  *Id.* at 123-24.  He further explained, "I can't write, I can't

do paperwork, I can't understand what I'm reading, I can't figure out where I'm going. I

start having panic attack[s] because the cars around me."  *Id.* at 124.  He experiences

panic attacks "on a daily basis" that last approximately thirty minutes.  *Id.*

Plaintiff's daughter, who was born on December 1, 1992, died on February 26,

1993.  *Id.* at 138.  Between December and February of every year, he goes through a

"grieving process."  *Id.* at 139.  During that time, he has nightmares and hears babies

crying when he's awake.  *Id.*  He explained,

> [T]he nightmares have got to the point where every time I lie down and go
> to sleep, I relive one of these nightmares.  I can't train my brain to stop.
> Nothing I have tried works, and the worst part about it is everybody I've

tried to take care of, I've failed, and I have nobody to take care of and I want to die. I just wish I was dead, and I can't stand this pain.

*Id.* at 139-40.

Plaintiff's typical day generally starts between three and seven in the morning. *Id.* at 116. When he gets up, he either fixes a cup of coffee or smokes marijuana. *Id.* at 117. He then watches television, sits in a chair, or lies down. *Id.* Between noon and two in the afternoon, he eats if someone makes something. *Id.* at 117-18. At least once a week, he stays in bed all day. *Id.* If he eats dinner, it is usually at 4:30 or 5:00. *Id.* at 118. He then watches television, smokes marijuana, and tries to go to sleep. *Id.* Plaintiff is able to dress himself, shower with the aid of a shower seat, make something simple to eat, and shop with his significant other with the aid of a cart he can ride. *Id.* at 119. He does not sweep, vacuum, or do laundry. *Id.* at 120. Plaintiff's hobbies include golf and riding a motorcycle. *Id.* He can no longer golf, and when he rode his motorcycle last, he crashed it. *Id.* at 121. He used to go for walks, bicycle rides, and motorcycle rides, but he does not anymore due to his injuries. *Id.* He currently resides with his girlfriend and her sister. *Id.* at 105. He periodically sees his girlfriend's two brothers. *Id.* at 125. When possible, he smokes marijuana three to five times per day. *Id.* at 132.

Plaintiff stated that he can walk for short distances, but it is "extremely painful." *Id.* at 112. He is only able to walk three to four minutes at one time. *Id.* at 130. He cannot stand for any length of time, but if he "stood for 30 minutes, that's amazing…." *Id.* at 112, 130. He can sit, but he has to rock. *Id.* at 112. He could lift five to ten pounds, but "[a]nything I lift hurts." *Id.* at 129. He "pretty much quit driving." *Id.* at

131.  Plaintiff's attorney asked if he could work at a job where he could sit most of the day, even alternating between sitting and standing, where he never has to lift more than ten pounds or "deal with people as part of job duties," and where he has to work eight hours per day, five days a week on a sustained basis.  *Id.* at 140-41.  Plaintiff responded that he could not "[b]ecause he can't have a clear thought," and his pain would not allow him to.  *Id.* at 141.

### B.  Medical Opinions

#### 1.  Kenneth Glass, M.D. and Joseph Hammann, LPCC-5

Plaintiff began counseling with Joseph Hammann, LPCC-5, in September 2012. *Id.* at 613-25.  Mr. Hammann indicated that Plaintiff's depression symptoms consisted of insomnia, fatigue, decreased motivation, irritability, and intermittent suicidal ideation with no intent.  *Id.* at 613.  He did not meet with Mr. Hammann again until April 2013. *Id.* at 600.  Mr. Hammann noted, "Client said he had no intrinsic motivation to be attending counseling at this time.  He does desire ongoing counseling to assist with his disability application…."  *Id.* at 601.  He continued counseling with Mr. Hammann through at least August 2013.  *Id.* at 593-94.

In July 2013, Dr. Kenneth Glass first examined Plaintiff and noted he was focused on pain and pain medication.  *Id.* at 629.  Dr. Glass's notes indicate that in September 2013, he was depressed, angry, and irritable, and he refused to consider taking antidepressant medication.  *Id.* at 626.  Dr. Glass advised him to continue counseling and to consider an antidepressant medication.  *Id.* at 627.

6

Dr. Glass and Mr. Hammann completed a Mental Impairment Questionnaire on September 24, 2013, and they responded to interrogatories on October 1, 2013 and October 2, 2013.  *Id.* at 631-34, 635-43.  They treated Plaintiff for major depressive disorder and anxiety.  *Id.* at 631, 636.  They identified several of his signs and symptoms, including but not limited to, appetite disturbance, sleep disturbance, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, hostility and irritability, intense somatic pain in his back and ankle, and PTSD.  *Id.* at 631-32.  They explained,

> Client, as part of his symptom picture and partially due to the loss of his child, experiences feelings of distrust to many authority figures including counselors and physicians.  He is concerned about being viewed as overly pathologized if agreeing to some treatment approaches.  He is currently considering psychotropic medication to augment the cognitive restructuring counseling he has been receiving.

*Id.* at 632.

Dr. Glass opined that his "[d]epression worsens the sensation of pain and ability to cope with pain.  *Id.*  He estimated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times in one month.  *Id.* at 633.  They concluded Plaintiff was extremely limited in his ability to maintain social functioning; maintain concentration, persistence, or pace; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychological based symptoms; accept instructions and

respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.* at 633-34.

Dr. Glass explained Plaintiff cannot respond appropriately to supervision, coworkers, and work pressure because "[h]e presents as dysphoric, slowed, constricted, depressed and at times irritable."  *Id.* at 638.  He is unable to understand, remember, and carry out simple work instructions without requiring close supervision on a consistent basis because "[h]e becomes preoccupied and inwardly focus[ed] on his own issues and agenda."  *Id.* at 639.

### 2.  Amita Oza, M.D.

Dr. Amita Oza examined Plaintiff on June 25, 2012.  *Id.* at 497.  She noted that Plaintiff complained of back, neck, and shoulder pain, foot problems, numbness in his left anterior thigh and fingers, and depression.  *Id.*  He said he was taking Tylenol No. 3, tramadol, and ibuprofen, "but nothing seems to be helping…."  *Id.*  He cried during the interview.  *Id.* at 498.  She found that his range of motion at the C-spine and both shoulders was restricted and that the range of motion at his hips towards extremes was painful.  *Id.*  He also had tenderness on palpation of his left ribs, lower lumbar spine, and between his shoulder blades.  *Id.*  There was "presence of paracervical and paravertebral muscle spasm."  *Id.*  He was able to elevate his left lower extremity up to forty-five degrees and his right up to thirty degrees.  *Id.*  He had numbness on his left lateral thigh, and he had full range of motion at his knees and ankles.  *Id.*  She noted that he limps, favoring his left side.  *Id.* at 499.

8

Dr. Oza concluded Plaintiff has chronic back pain, may have left-sided lumbar radiculopathy, and has neck, shoulder, hip, and left-foot pain. *Id.* Additionally, he is very depressed. *Id.* She determined that "work related activities even at sedentary level seems [sic] to be difficult." *Id.*

### 3. Giovanni M. Bonds, Ph.D.

Dr. Giovanni Bonds, a clinical psychologist, evaluated Plaintiff on May 22, 2012. *Id.* at 477. Dr. Bonds noted that he reported "chronic pain throughout his body due to a history of accidents." *Id.* at 479. His mood seemed very depressed, and he broke into tears during the interview. *Id.* at 480. Dr. Bonds noted that Plaintiff "seemed tense" and described himself as "constantly nervous and feeling like he is vibrating inside." *Id.* Plaintiff said that he had panic attacks in the past but they "have decreased and occur infrequently." *Id.* He was prescribed Vicodin and ibuprofen for pain. *Id.* at 479, 481. Dr. Bonds diagnosed him with Depressive Disorder and Anxiety Disorder. *Id.* at 482. Dr. Bonds concluded that he "did not display difficulties with understanding and following directions;" his "attention and concentration were satisfactory during the evaluation;" "he acted very emotional and reported that he has had some difficulties in relationship with others…;" and "[h]e would be able to deal with normal work demands for speed, accuracy, productivity and dealing with changes in the work place." *Id.* at 482-83.

### 4. Teresita Cruz, M.D. and Michael Lehv, M.D.

Dr. Teresita Cruz reviewed Plaintiff's records on August 6, 2012. *Id.* at 152-66. She determined that Plaintiff could occasionally lift and/or carry twenty pounds and

frequently lift and/or carry ten pounds.  He could stand and/or walk for a total of four hours in an eight-hour day, and he could sit for a total of six hours.  *Id.* at 160.  He could never climb ladders, ropes, and scaffolds, occasionally crouch and crawl, and frequently climb stairs and ramps, balance, and kneel.  *Id.*  Plaintiff was limited in reaching overhead "due to pain in neck and shoulder and decreased [range of motion]."  *Id.* at 161.  He should avoid concentrated exposure to hazards such as machinery and heights.  *Id.*  Dr. Cruz concluded that Plaintiff was not disabled because "despite [his] impairments, [he is] still able to perform some work activities."  *Id.* at 165.  Dr. Michael Lehv reviewed Plaintiff's records on January 17, 2013 and reached the same conclusion as Dr. Cruz.  *Id.* at 184-97.

### 5.  Carl Tishler, Ph.D. and Frank Orosz, Ph.D.

Dr. Carl Tishler reviewed Plaintiff's records on June 11, 2012.  *Id.* at 152-63.  He found the following medically determinable impairments: disorder of back, diabetes mellitus, affective disorder, and anxiety disorder.  *Id.* at 157-58.  He noted that Plaintiff was moderately limited in his abilities to "maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  *Id.* at 162.  Dr. Tishler explained that "he would have a reduction in concentration due to anxiety."  *Id.*  Plaintiff was moderately limited in his "ability to accept instructions and respond appropriately to criticism from supervisors."  *Id.*  Dr. Frank Orosz reviewed Plaintiff's records on January 17, 2013 and reached the same conclusions as Dr. Tishler.  *Id.* at 184-97.

10

### 6.  Chad Weber, D.O.

On January 7, 2012, the day after Plaintiff's motorcycle accident, he went to the Miami Valley Hospital Emergency Room complaining of pain in the left side of his ribs and pain in his left foot.  *Id.* at 388.  A CT of his chest revealed nondisplaced fractures of the lateral left seventh, eighth, and ninth ribs and lower right-sided rib fractures.  *Id.* at 403.  A CT scan of Plaintiff's left foot revealed a lisfranc fracture.  *Id.* at 434-35.  When Dr. Chad Weber first examined Plaintiff on January 11, 2012, he determined that he needed surgery on his left foot but it was too swollen.  *Id.*  Dr. Weber prescribed Vicodin.  *Id.* at 435.  He examined Plaintiff again on January 17, 2012, and he determined Plaintiff's foot was still too swollen for surgery and prescribed Flexeril and Ketorolac Tromethamine.  *Id.* at 430-32.

On January 24, 2012, Dr. Weber performed an open reduction and internal fixation on Plaintiff's left foot.  *Id.* at 444-46.  Dr. Weber ordered Plaintiff to be "nonweightbearing" for at least six to eight weeks, placed him on aspirin, and prescribed Bactrim and oxycodone.  *Id.* at 446.  On January 31, 2012, Dr. Weber removed some stitches and prescribed Percocet.  *Id.* at 426-27.  On February 10, 2012, Dr. Weber removed the remainder of the stitches and refilled the Percocet prescription.  *Id.* at 424-25.  On March 14, 2012, Dr. Weber told Plaintiff he could start to be weight-bearing with semi-rigid inserts in stiff-soled shoes, and he prescribed Vicodin.  *Id.* at 422-23.  On April 25, 2012, Dr. Weber noted he did not get inserts and did not start putting weight on his foot.  *Id.* at 419-20.  Dr. Weber prescribed Vicodin.  *Id.* at 420.

III.    **Standard of Review**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

12

scintilla of evidence but less than a preponderance….."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Pope to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

| | |
|---|---|
| Step 1: | Plaintiff has not engaged in substantial gainful employment since April 10, 2012. |
| Step 2: | He has the severe impairments of degenerative disc disease of the lumbar spine and cervical spine, status post left-sided lisfranc fracture, depression, anxiety, and posttraumatic stress disorder. |
| Step 3: | He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |

13

Step 4:    His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consisted of light work "except he is limited to unskilled work without strict production rate pace work; involving no more than occasional changes in the work environment; and no more than occasional contact with supervisors; with only occasional crouching, crawling, and reaching overhead bilaterally; he may only frequently climb ramps and stairs, balance, stoop[,] and kneel; never climb ladders, ropes, and scaffolds; and he must avoid concentrated exposure to hazards."

Step 4:    He is unable to perform any of his past relevant work.

Step 5:    He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 78-93).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 93.

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ's failure to follow Social Security Regulations in weighing medical evidence denotes a lack of substantial evidence and error as a matter of law.  The Commissioner maintains that the ALJ reasonably evaluated medical opinions in the record and that substantial evidence supports the ALJ's findings.  These arguments highlight the significant differences between types of medical sources described in the Social Security Regulations.

### A.    **Dr. Glass and Mr. Hammann**

Social Security Regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Id.* (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (2)).  To effect this hierarchy, the Regulations adopt the treating physician rule.  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [a claimant's] case record."

*Id.* (citation omitted); *see Gentry*, 741 F.3d at 723.  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to

15

any subsequent reviewer the weight given and the reasons for that weight. *Id*.

Substantial evidence must support the reasons provided by the ALJ. *Id*.

The ALJ gave Dr. Glass's and Mr. Hammann's opinions "little weight." (Doc. #6, *PageID* #89). Although Dr. Glass and Mr. Hammann submitted responses to the interrogatories and the medical impairment questionnaire together, the weight of their opinions should be considered separately. As a licensed physician, Dr. Glass is an "acceptable medical source" who can provide medical opinions and be considered a treating source. 20 C.F.R. §§ 416.927(a)(2), 416.902. In comparison, Mr. Hammann, a Licensed Professional Clinical Counselor, is not an acceptable medical source and instead falls under the category of "other sources." 20 C.F.R. § 416.913(d). Evidence from "other sources" can only be used to show the severity of impairments and how it affects the claimant's ability to work. 20 C.F.R. § 416.913(d). While an ALJ is required to weigh and provide "good reasons" for discounting the weight given to a treating source opinion, an ALJ is not required to explain the weight given to "other sources." *Gayheart,* 710 F.3d at 376; Soc. Sec. Rul. No. 06-03p, 2006 WL 2329939, at *6 (Soc. Sec. Admin. Aug. 9, 2006). Due to the vast differences between the types of sources, the ALJ should evaluate each separately to prevent confusion.

It is not clear from the ALJ's decision whether the ALJ classified Dr. Glass as a "treating source" or as a "nontreating source." Although the ALJ initially refers to Dr. Glass as Plaintiff's "treating psychiatrist," there is no other indication that he considered Dr. Glass to actually be Plaintiff's treating physician. (Doc. #6, *PageID* #88). Further,

16

the ALJ did not expressly address whether Dr. Glass's opinion was entitled to controlling weight under the treating physician rule. 20 C.F.R. § 416.927(c)(2).

Plaintiff contends that the ALJ determined that Dr. Glass is Plaintiff's "treating psychiatrist," and the ALJ failed to properly weigh his opinion as required by the Social Security Regulations and Sixth Circuit case law. (Doc. #7, *PageID* #s 654-57). The Commissioner asserts that the ALJ provided a number of reasons for assigning Dr. Glass's opinion little weight. (Doc. #11, *PageID* #678). The reasons, according to the Commissioner, also bear on whether Dr. Glass should be considered a treating source. *Id.*

Because only treating physicians' opinions can be entitled to controlling weight, an ALJ must first determine whether a physician is treating source before determining the weight of the physician's opinion. *Blakley,* 581 F.3d at 407. "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant… 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)].'" *Id.* (citing 20 C.F.R. § 404.1502). A medical source who has treated or evaluated the claimant only a few times could be considered a treating source "if the nature and frequency of the treatment or evaluation is typical" for the claimant's condition. 20 C.F.R. § 416.902. The Sixth Circuit held that a physician who only examined the claimant once and wrote a single physical capacity evaluation was not a treating source. *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007). Additionally, a physician who examined the claimant once, completed a medical report,

17

prescribed and refilled medication, and denied additional medication was not treating source. *Id.  See Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490-91 (6th Cir. 2005) ("Daniels's two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions."); *cf. Blakley,* 581 F.3d at 407 ("Dr. Kiefer treated Blakley's neck injury and performed the discectomy. As such, Dr. Kiefer developed an extensive treatment relationship, spanning over one year, and qualifies as one of Blakley's treating physicians.").

If Dr. Glass is Plaintiff's "treating psychiatrist," then the ALJ failed to apply the legal standards required by the treating physician rule.  The ALJ does not discuss whether Dr. Glass's opinion is supported by medically acceptable clinical and laboratory diagnostic techniques or whether the opinion is not inconsistent with other substantial evidence in the case record.  In the middle of describing the questionnaire Dr. Glass completed, the ALJ mentions, "the opinions related to functional limitations are not supported with objective medical findings and are inconsistent with the substantial evidence of record."  (Doc. #6, *PageID* #89).  That conclusory statement merely mimics the applicable standards without providing "good reasons" to support it.  It is, therefore, not sufficient to establish that Dr. Glass is not entitled to controlling weight as a treating physician.

The ALJ did address some of the factors used to weigh all types of medical sources' opinions.  *Id.*  First, the ALJ argued that Dr. Glass's opinion was the "product of a pre-printed questionnaire" that includes "a number of leading questions and similar

18

inducements, which are not designed for objective responses…." *Id.* The ALJ did not

provide any examples to support his assertion. The ALJ does note that the forms "do

allow for negative responses as well as positive ones…." *Id.* Plaintiff correctly

observed, "it is unclear how standard questionnaires (modeled after Social Security

Listings and Regulations) forwarded to medical providers by representatives for

development of claimant's application for benefits differs from the form

evaluations/reports that are rendered every day by compensated State Agency

evaluators." (Doc. #7, *PageID* #656).

Further, the ALJ asserts that Plaintiff was examined by Dr. Glass "not in an

attempt to seek treatment for symptoms, but rather, through attorney referral…." (Doc.

#6, *PageID* #89). However, "there is nothing inherently improper or biased about the act

of paying for the opinion of an examining physician, whether paid by the Social Security

Administration or the state agency or a plaintiff." *Barker v. Comm'r of Soc. Sec.,* No.

3:07cv174, 2008 WL 4444739, at *11 (S.D. Ohio Sept. 29, 2008) (citing and quoting

parenthetically *Lester v. Chater,* 81 F.3d 821, 832 (9th Cir, 1996)) ("The [Commissioner]

may not assume that doctors routinely lie in order to help their patients collect disability

benefits."). Additionally, "it is a questionable practice to chastise one with a mental

impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v.

Bowen,* 874 F.2d 1116, 1124 (6th Cir. 1989). This is especially true in light of Plaintiff's

difficult relationship with the medical community. Notably, the ALJ completely failed to

acknowledge Plaintiff's troubled relationship with doctors. For example, Dr. Glass and

Mr. Hammann noted that Plaintiff "experiences feelings of distrust to many authority

figures including counselors and physicians." (Doc. #6, *PageID* #598). Mr. Hammann also wrote that Plaintiff told him, "it is difficult to trust anyone since his 3 mos. old daughter died in 1993. David says the crew refused to try and resuscitate her. He said they then got together and lied about this fact." *Id.* at 593. Additionally, Plaintiff testified that he has "a lot of anger towards the medical community." *Id.* at 122.

Finally, the ALJ asserts Plaintiff only met with Dr. Glass twice at the time of the hearing. *Id.* at 89. The ALJ does not acknowledge that Plaintiff met with Mr. Hammann prior to meeting Dr. Glass, he saw Mr. Hammann more frequently than Dr. Glass, and Mr. Hammann worked with Dr. Glass at Family Services. In a similar situation, the Ninth Circuit considered the effect of a treatment team in determining whether a physician qualified as a treating physician. *Benton ex rel. Benton v. Barnhart,* 331 F.3d 1030, 1039 (9th Cir. 2003). The Court found,

> Dr. Zwiefach is transmitting both his own knowledge and opinion of [Plaintiff] Benton *and* those of the medical treatment team under his supervision. Even if he were not entitled to complete the Mental RFC Assessment based upon his own direct experience with a patient, nothing in the language of § 404.1502 forecloses his doing so on behalf of his treatment team. This is not the same as evaluating Benton's case from the cold record; Dr. Zwiefach has had the opportunity to direct and communicate with the treatment team over time, and is presumably well placed to know their skills, abilities, and therapeutic techniques. In assigning weight to Dr. Zwiefach's opinion, the ALJ may of course consider how well the treatment team operated in informing Dr. Zwiefach.

*Id.* As part of Plaintiff's treatment team, how Mr. Hammann informed Dr. Glass of Plaintiff's counseling may influence the weight assigned to Dr. Glass's opinion. While the ALJ correctly observed that Plaintiff only met with Dr. Glass twice before the hearing, the ALJ did not acknowledge that he met with Mr. Hammann seven times.

Although the ALJ considered some factors in weighing Dr. Glass's opinion, "these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376.  Because the ALJ did not address the treating physician rule, we cannot engage in a meaningful review of the ALJ's decision to give Dr. Glass's opinion little weight.

The ALJ also gave Mr. Hamman's opinion "little weight" but did not explain why. Mr. Hammann's opinion falls under the category of "other sources."  20 C.F.R. § 416.913(d).  Although "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment," the information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Soc. Sec. Rul. No. 06-03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006).  The same factors used to evaluate acceptable medical sources can be used to evaluate opinions from other sources.  *Id.* at *4-5.  These factors include, but are not limited to, the length and frequency of the relationship, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise, and other factors that tend to support or refute the opinion.  *Id.* at *4-5.  Although not required by the Regulations, "the adjudicator generally *should* explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning…."  *Id.* at *6 (emphasis added).

The ALJ is not required to explain the weight assigned to Mr. Hammann's opinion. However, because Mr. Hammann's treatment of Plaintiff is intertwined with Dr. Glass's treatment and resulting opinion, it is particularly relevant to this case. Additionally, the Social Security Administration has recognized, "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources'… have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists." Soc. Sec. Rul. No. 06-03p, 2006 WL 2329939, at *3 (Soc. Sec. Admin. Aug. 9, 2006). This is particularly significant in Plaintiff's case due to his lack of health insurance and income. (Doc. #6, *PageID* #114). Further, even if the ALJ does not weigh Mr. Hammann's opinion, the ALJ should, at the very least, consider the effect that Mr. Hamman's treatment of Plaintiff has on the weight of Dr. Glass's opinion.

### B.    Non-Examining State Agency Sources

If the treating doctor's opinion is not given controlling weight, the ALJ must consider the following factors when weighing medical opinions: examining relationship, treatment relationship (including length, frequency, nature, and extent), supportability, consistency, specialization, and other relevant factors. 20 C.F.R. § 404.1527(c). Social Security Regulations require the ALJ to apply the same level of scrutiny in weighing opinions of non-treating sources as applied to treating source opinions. *Gayheart,* 710 F.3d at 379.

22

The ALJ concluded that the opinions of the non-examining State agency medical consultants were entitled to "great weight."  (Doc. #6, *PageID* #s 90-91).  He explained,

> [T]hey are consistent with other objective medical evidence of record and they are consistent with the claimant's alleged activities of daily living. The State agency medical consultants are well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended.  The state agency medical consultants reviewed the medical evidence of record.

*Id.*

The ALJ erred by failing to apply the same level of scrutiny to the State agency medical consultants' opinions as he applied to Dr. Glass's opinion.  *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)) ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires.").  For example, the ALJ asserts that Dr. Glass's opinion should be given less weight because he only met with Plaintiff three times, but the ALJ does not criticize the State agency consultants' opinions despite the fact that they never examined Plaintiff.

Additionally, the ALJ did not provide any examples of objective medical evidence that are consistent with the State agency physicians' opinions, and he did not identify activities of daily living that are consistent with their opinions.  The ALJ also fails to acknowledge discrepancies between Dr. Glass's opinion and the reviewing physicians' opinions.  For example, Dr. Tishler found that there was "no evidence of limitation" and Dr. Orosz found that Plaintiff was "not significantly limited" in three categories that Dr.

Glass concluded Plaintiff was extremely limited in, including, the abilities to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

The ALJ asserts that "[t]he evidence received after the agency rendered its opinion does not show any significant decline in the claimant's condition.  Consequently, it remains consistent with the record as a whole."  (Doc. #6, *PageID* #s 90-91).  However, the ALJ fails to acknowledge that the State agency medical consultants reviewed Plaintiff's records in June and August 2012 and January 2013, before Plaintiff attended any treatment with Dr. Glass.  Additionally, their reviews occurred well before Dr. Glass and Mr. Hammann provided responses to the mental impairment questionnaire and interrogatories.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

**C.    Remand Is Warranted**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the

24

plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is weak. *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is weak. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff David L. Orleck  was under a "disability" within the meaning of the Social Security Act;

3.      This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

3.      The case be **TERMINATED** on the docket of this Court.


Date: July 28, 2016                          *s/Sharon L. Ovington*
                                              Sharon L. Ovington
                                              Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).